Craig L. Pankratz (U.S.B. No. 12194)
clp@ccplawyers.com
David M. Corbett (U.S.B. No. 13946)
dmc@ccplawyers.com
**CHRISTENSEN CORBETT & PANKRATZ, PLLC**
136 East South Temple, Suite 1400
Salt Lake City, Utah 84111-3156
Telephone: (801) 303-5800
Facsimile: (801) 322-0594
*Attorneys for Plaintiffs*

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF UTAH

| | |
|---|---|
| STEVE S. CHRISTENSEN AND STEVE S. CHRISTENSEN, P.C., <br><br> Plaintiffs <br><br> vs. <br><br> RAYMOND MADSEN, <br> 190 Taylor Blvd. <br> Sequim WA 98382 <br><br> Defendant/Debtor. | **COMPLAINT FOR DECLARATORY RELIEF** <br><br> Bankruptcy Case No. 13-16327-MLB W.D. Wash. <br><br> Chapter 7 <br><br> Adv. Proc. No. _____ <br><br> Judge _____ |

COME NOW Plaintiffs, Steve S. Christensen and Steve S. Christensen, P.C. (collectively "Steve"), by and through their attorneys, and allege the following in support of their complaint for declaratory relief:

## PARTIES AND PROCEDURAL HISTORY

1. Plaintiff, Steve S. Christensen, is an attorney engaged in the practice of law and is a resident of Salt Lake County, Utah.

2. Plaintiff, Steve S. Christensen, P.C., is a Utah professional corporation engaged in the practice of law, whose principal place of business is Salt Lake City, Utah. Steve S. Christensen is the sole owner of Steve S. Christensen, P.C.

3. Steve is the assignee of Hirschi Christensen, PLLC, which was a Utah professional limited liability company engaged in the practice of law, whose principal place of business was Salt Lake City, Utah. Steve was a partner and owner at Hirschi Christensen, PLLC.

4. Steve is the assignee of the accounts receivable stemming from his representation of Linda Diane Beck ("Beck") while he was a partner at Hirschi Christensen, PLLC in a divorce action against Raymond Madsen. He did not purchase the accounts receivable.

5. Defendant Raymond Madsen ("Madsen") is a resident of Sequim, Washington.

6. The events giving rise to Steve's claims against Madsen occurred primarily within the State of Utah.

7. On February 22, 2012, Steve filed a complaint for damages against Madsen in Utah's Third District Court, which is still pending.

8. On July 10, 2013, Madsen filed for chapter 7 bankruptcy in the United States Bankruptcy Court for the Western District of Washington, case number 13-16327-MLB.

9. The court in the Utah case has imposed a stay on all proceedings until bankruptcy proceedings have concluded.

## **GENERAL ALLEGATIONS**

10. Steve incorporates by reference the preceding allegations as if set forth in full herein.

11. In August 2002, in Salt Lake County, Utah, Beck retained Steve as her attorney in a divorce action against Madsen.

12. Steve agreed to represent Beck in the divorce action, and Beck agreed to pay Steve for his services.

13. Although one was provided to her, Beck never signed a written retainer.

14. Under their oral contract, Steve and Beck did not agree as to the deadline when Beck would be required to pay Steve for his services. However, Steve through his law firm, Hirschi Christensen, PLLC, sent Beck monthly bills and expected payment in full within 30 days of each bill. Although she did make some payments, Beck failed to pay a significant portion of her legal fees.

15. Despite Beck's failure to pay her legal fees in full, Steve agreed to continue to represent Beck in anticipation of future payment of past and future legal fees even though timely interim payments were not made, and with this understanding, Beck continued employing him.

16. Beck later retained Steve to represent her in making certain alterations to her father's trust and conservatorship.

17. During the course of Steve's relationship with Beck, Steve represented Beck in trial, appeal, and mediation proceedings.

18. The initial meeting and all subsequent meetings between Beck and Steve were in Salt Lake City, Utah.

19. Steve performed a significant amount of work for Beck from his office in Salt Lake County, Utah. This representation resulted in Beck incurring $45,199.75 in unpaid legal fees

during the divorce action, including the appeal. She also incurred an additional $9,765.09 in unpaid legal fees from Steve's representation related to the trust and conservatorship of her father.

20. Steve successfully obtained a divorce on behalf of Beck in 2004.

21. Initially, Steve obtained a monthly temporary alimony award of $1,400 for Beck in February 2003. This award lasted for about nine months. This resulted in a temporary alimony award of approximately $12,600.

22. From November 2003 through May 2004, the divorce court reduced Beck's monthly temporary alimony to $900. This resulted in a temporary alimony award of approximately $6,300.

23. The divorce court awarded Beck $900 in permanent alimony.

24. Steve successfully appealed the divorce court's divorce decree. In fact, the Utah Court of Appeals reversed almost all of the divorce court's orders that were not in Beck's favor.

25. On December 10, 2007, on remand, the divorce court entered its *Second Amended Findings of Fact and Conclusions of Law*. Madsen did not agree with the *Second Amended Findings of Fact and Conclusions of Law* and filed his *Notice of Appeal* on January 7, 2008.

26. Under the *Second Amended Findings of Fact and Conclusions of Law*, Beck was entitled to receive one-half of Madsen's retirement accounts and $1,485.91 each month beginning June 1, 2004 in alimony.

27. Under the *Second Amended Findings of Fact and Conclusions of Law*, Steve successfully obtained for Beck a Chrysler vehicle valued at $15,000 that was not encumbered by a debt.

28. Under the *Second Amended Findings of Fact and Conclusions of Law*, Steve successfully obtained for Beck approximately $50,000 from Madsen's DMBA retirement account.

29. Under the *Second Amended Findings of Fact and Conclusions of Law*, Steve successfully obtained for Beck one-half of his military retirement account.

30. Under the *Second Amended Findings of Fact and Conclusions of Law*, Steve successfully obtained for Beck $25,000 from the sale of Beck and Madsen's marital home.

31. Under the *Second Amended Findings of Fact and Conclusions of Law*, Steve successfully obtained for Beck an increased alimony award for Beck in the amount of $1,485.91 a month from June 1, 2004 that was to last until Beck remarried or cohabitated, one of the parties died, or thirty-four years, whichever came first, for a maximum potential alimony award of $606,251.28.

32. Under the *Second Amended Findings of Fact and Conclusions of Law*, Steve successfully obtained for Beck an order that Madsen pay Beck back alimony for the monthly difference between the $900 in monthly alimony he actually paid starting on June 1, 2004 and the $1,485.91 that the divorce court ordered him to pay on December 3, 2007, or $24,608.22 ($585.91 x 42 months).

33. Thus, under the *Second Amended Findings of Fact and Conclusions of Law*, Beck was entitled to as much as $696,251.28 in money and property from Madsen.

34. Steve was discharged before collecting any of the judgments he obtained for Beck on appeal.

35. Steve holds an attorney lien for the balance of compensation due from Beck that attaches to any property that is the subject of or connected with the work performed for her.

36. Beck retained the benefit of Steve's services without full and complete payment for the services.

37. Steve filed a notice of attorney lien on the proceeds of the divorce case between Madsen and Beck with the Utah Fourth District Court on September 21, 2007.

38. Notice of Steve's attorney lien was first recorded in the Salt Lake County Recorder's office on April 29, 2004. The notice of lien states that Steve was asserting an attorney lien "upon all moneys or property received from Raymond William Madsen, including alimony."

39. Steve notified Madsen in or about November 2007 that he had an attorney lien and directed Madsen to make all "ongoing support payments" directly to Steve.

40. On July 2, 2008, Steve told Madsen that all "future support payments" were to be paid to Steve.

41. Both Madsen and Beck had actual knowledge of the attorney lien no later than November 15, 2007.

42. In a letter dated November 15, 2007, Madsen sent a check made out to both Beck and Steve's assignor, Hirschi Christensen, PLLC. On the memo line, Madsen wrote, "1/2 month Alimony for Linda Beck & neo gadinaton Robbers." [sic.] (The Gadianton Robbers are a group of robbers in the Book of Mormon who conspired to gain power and wealth through theft and murder.)

43. Another payment, this one dated December 3, 2007, from Madsen to Beck and Hirschi Christensen was received by Steve on or about December 17, 2007.

44. Steve represented Beck until December 17, 2007 when he received a letter dated December 13, 2007 from Beck formally discharging him. In the letter, Beck said, "You may continue taking my extra monies that were awarded to me in the Appeal, until I can figure out what to do about paying the bill." *Id.*

45. Unknown to Steve, prior to sending the letter, Madsen and Beck had begun working together in an effort to avoid paying the attorney fees Beck owed to Steve.

46. On or about November 15, 2007, Madsen and Beck began corresponding through email.

47. In their emails, Madsen and Beck discussed the entry of a Qualified Domestic Relations Order ("QDRO") that would divide Madsen's retirement account with DMBA. Madsen and Beck agreed that they would file the QDRO without informing either of their attorneys. Madsen told Beck, "I really believe [Steve] will do what [he] can to intercept and cause problems. Get your money in hand, then lets [sic.] try to deal with the final issues if possible without the attorney's [sic.]."

48. Beck responded, "I agree they do not need to know that you and I are working on the QDRO without them."

49. On December 11, 2007, Madsen wrote Beck about the QDRO, "I said I would hand carry the signed QDRO from you, to the court, and when received signed by the judge I will walk it to DMBA [sic.]. Have you received the document? That's $50,000 for you, I don't want to see your attorney's [sic.] getting their hands on that money."

50. The next day, Madsen outlined a plan in which Beck could avoid paying Steve while still receiving her half of the DMBA retirement account. He said, "This is sticky wicky. At this point

it is not you they would go after, but me…but, [sic.] I am okay with that as long as we have the QDRO safely taken care of. Do not let your lawyer know that it is being done, or I do believe they will go after that money." He closed by saying that he would help Beck if she were willing to work with him. A few hours later, Madsen said that he wanted to work with Beck to figure out how to "have the court drop [her] attorney's fees."

51. On December 18, 2007, Madsen and Beck, filed an Amended Qualified Domestic Relations Order dividing Madsen's retirement account.

52. In addition to agreeing to prevent Steve from executing his attorney lien against the retirement funds divided in the QDRO, Madsen and Beck conspired to prevent Steve from receiving any portion of the alimony being paid to Beck. Madsen was required to pay $1,485.91 alimony each month in two payments of approximately $742.95. Of each payment, Beck would receive $450.00, and Steve would receive $242.95 pursuant to his attorney lien. Madsen honored this arrangement in November 2007 and December 2007.

53. On November 15, 2007, Beck emailed Madsen and asked him to send separate checks to her and Steve instead of one made out to both her and Steve's law firm. Madsen expressed some reticence in sending separate checks and instead sent a check made out to Beck and Steve's law firm.

54. On December 11, 2007, Madsen and Beck exchanged multiple emails in which Beck complained that she had not received her share of the November 30, 2007 alimony payment. She pleaded with Madsen to "Please show some guts, and just split the payments so I don't have to deal with these A-hole middle men."

55. Madsen assured her that he had sent a recent alimony check. He also said, "I agree something has to be done to get you your amount [of alimony] in a timely fashion." He decided that he would send separate checks, and both Madsen and Beck asked Steve for permission to send separate checks.

56. Steve told them that he approved of Madsen sending separate checks.

57. If this arrangement would have continued, Beck would have received $900 each month, and Steve would have received about $486 each month toward the attorney fees Beck owed him.

58. However, neither Beck nor Madsen wanted Steve to receive any part of the alimony payments as compensation for the work he did for Beck. On December 21, 2007, Madsen emailed Beck and proposed that they agree to return their situation to how it was before Beck won on appeal. He suggested that they proceed as they had done with the QDRO. He said, "If you can agree to work with me, I am confident we can finish this up quickly without any attorney's [sic.] like we did with the QDRO and get on with our life without them (the attorney's [sic.]) in it." He also said, "If we work together to settle this with one final document to the Judge that puts things as they were in 2004-and I also think we put in that document to remove the lien and all outstanding attorney fees (for you) to be suspended. That way you stand to gain and your attorney would not have any hold over you and your finances."

59. Five days later, on December 26, 2007, Madsen sent Beck another email. He informed her that the QDRO had been accepted by DMBA and that Beck would receive her share of his DMBA retirement account. He closed by saying,

> Assuming the QDRO is done, the next thing is how to deal with your alimony. Do you still want me to withhold the monies the court ordered paid, from your

attorney? Do you want to write him telling him, or should I? Perhaps a letter from both would be best. I expect in any case they will not be happy and will most likely come after me or you. Are you ready for that? Can we work together to finalize this with a joint amended divorce decree to the judge with both of our signatures on it like we did the QDRO as I suggested earlier? It appears the Judge has acknowledge [sic.] the previous document signed by both of us and I think we can lay this whole thing to rest once and for all. Please let me know.

*Id.*

60. On January 13, 2008, Beck sent Madsen an email with the subject line, "I will try to work with you." Beck said that she needed at least $1,200 in monthly alimony.

61. Madsen replied the next day and attached a proposed amended divorce decree in which he agreed that Beck would receive $1,200 in monthly alimony. He also said,

I have retained the portion previously mentioned in the decree about your attorney lien, whereby the lien be "revolked" [sic.] and I pay alimony directlily [sic.] to you. This may be a sticky issue with the courts, I really don't know. You mentioned in previous communication that you had something in the works that would get them off both of our backs. If that be the case then we should probably take that out of the decree and just focus just on the alimony payments, which I think would be like the QDRO where we were both in agreement and the Judge would quickly act on.

If you want to keep it in and try it, and are agreeable to Amended Decree as is, print it out, have it notarized and mailed to me quickly, as we are still working under the time constraints of the appeal that Skeen has already filed, which I will see him on tomorrow. If you think it best (and I do) to leave the issue of the "attorney lien" out of this and leave it to you to deal with as a separate issue, let me know and I will change it.

*Id.*

62. Five days later, Beck, who had fired Steve in December 2007, signed a stipulation that agreed to reduce his monthly alimony payment to $1,200. The stipulation also contained the following provision, "The parties agree that all monies owed for past due alimony, property

settlement, attorney's fees, etc., have been paid and that neither party is indebted to the other as of the date of the execution of the agreement."

63. The divorce court entered an order on January 23, 2008 which approved of Madsen and Beck's stipulation. The order's effect was to forgive Madsen's more than $24,608.22 debt for alimony arrearages and to save him $285.91 each month in alimony.

64. Steve never received prior notice of the January 2008 stipulation or order. Indeed, Madsen and Beck actively concealed the stipulation and order from Steve.

65. At the time that Madsen and Beck entered into the January 23, 2008 stipulation, the divorce appeal between them remained open.

66. On February 29, 2008, Madsen filed *Motion for Release of Bond*. In his motion, Madsen stated that he would not proceed with his appeal as to the *Second Amended Findings of Fact and Conclusions of Law* because he and Beck had entered into the January 23, 2008 stipulation.

67. After the entry of the January 23, 2008 order, Madsen stopped sending Steve a separate check for alimony, and on July 2, 2008, Steve sent a letter to Madsen informing him again that he was asserting an attorney lien, pursuant to Utah law, against all alimony payments made to Beck. Steve again formally requested Madsen to direct all alimony payments and alimony arrearage payments to him until Beck's debt had been repaid. He also warned Madsen that failure to do so could result in legal action.

68. Madsen responded on July 28, 2008. Madsen refused to direct alimony payments to Steve and said, "I am not nor have I been in arrears in my alimony payments to Ms. Beck. In fact payments are made from direct deposit twice a month to Ms. Beck to ensure she has her court

ordered alimony payments in a timely manner, … To do otherwise … would make me like unto you and your firm, a Gadinaton [sic.] Robber." *Id*. Then, he revealed that he and Beck had worked together on the QDRO and on the January 23, 2008 order. *Id*.

69. Before sending the July 28, 2008 letter, Madsen sent Beck an email:

> Some time ago you said you had a plan "that in a couple of weeks will get them off both of our backs." Here they are again. I can only delay them by not cooperating with them. It is up to you to find a way to clear yourself of their tactics. So it seems I am only buying you some time.

*Id*.

70. On September 15, 2008 Beck wrote a letter and stated that she would not pay the attorney fees she owed to Steve. Even though Steve successfully pursued an appeal at her direction, obtained a court order for over $24,608.22 in alimony arrearages, achieved a $1,485.91 award of monthly alimony, captured one-half of Madsen's DMBA retirement account, and secured one-half of Madsen's military retirement—approximately $696,251.28 in money and property from Madsen—Beck berated Steve for the "horrible" job he had done.

71. The above-described conduct occurred within the State of Utah while Madsen was a resident of the State of Utah.

72. Madsen later moved to the State of Washington.

73. In 2010, Madsen again approached Beck in an effort to modify his obligations to her. To convince her to agree to the modification, Madsen told Beck that he stood up for her against her brother and her attorney and had supported her in other ways. But Madsen warned,

> We can work together to file the Change of Condition and both sign it and move on, or go back to court. This time however instead of letting the attorneys play games as they did last time, I will be active in any way I need to direct the affairs

> and if necessary including information provided by your brother and other issues that I held back on.

*Id.* The information Madsen intended to use against Beck if she did not stipulate to the modification was that Beck had allegedly embezzled funds.

74. Without notifying Steve, Madsen and Beck filed a stipulation on March 7, 2011 in which Beck agreed to release her interest in Madsen's military retirement and reduce his monthly alimony obligation to $500. On March 25, 2011, the divorce court entered an order approving the stipulation.

75. Madsen and Beck's stipulation on January 23, 2008 to reduce alimony and to release claims of back alimony was motivated by the intent to delay, hinder, or defraud Steve as Beck's creditor.

76. Madsen and Beck have communicated with each other through email or other means to create a plan by which Beck could avoid payment of her obligations to Steve.

77. As part of the plan concocted in Madsen and Beck's communications, Madsen agreed to engage in tactics calculated to delay, hinder, and defraud Steve as Beck's creditor.

78. Madsen's refusal to comply with Steve's request for payment and assertion of the attorney lien occurred after Madsen's communications with Beck.

79. Madsen has provided advice and counsel to Beck in methods to avoid payment of her obligations to Steve.

80. Madsen and Beck's actions, individually and collectively, have injured Steve by delaying, hindering, or defrauding him as Beck's creditor.

81. Madsen and Beck actively took steps to conceal from Steve their actions to ensure that he would not receive any payment for the services he rendered Beck or any portion of the property that Madsen was obligated to pay Beck.

82. Madsen and Beck actually did conceal their actions from Steve and prevented him from discovering what they had done until July 28, 2008, at the earliest. On July 28, 2008, Steve received information from Madsen that Madsen and Beck may have conspired together to defraud him, avoid his attorney lien, and prevent him from receiving the benefits he was entitled to under the contract between him and Beck. On the same day, he received information that Madsen may have intentionally interfered with Steve's economic relations with Beck.

83. Steve did not know and could not have know before July 28, 2008 that Madsen and Beck conspired together to defraud him and avoid his attorney lien or that Madsen had intentionally interfered with Steve's economic relations with Beck.

84. Steve did not know and could not have known before September 15, 2008 that Beck would not ever pay her legal fees because prior to that time she consistently told him that she would find a way to pay him.

85. At no time during the course of these events did Steve engage in a consensual transaction with Madsen. They have never entered into a contract. Madsen never guaranteed Beck's obligations to Steve. And Steve has never represented Madsen.

86. Beck incurred $45,199.75 in unpaid legal fees to Steve for his work on her divorce, including the appeal.

87. Beck incurred at least an additional $28,194.29 in interest on the balance owing for the legal fees from the divorce action, including the appeal. The interest has been calculated at the statutory rate of 10% per annum.

88. Beck also incurred $9,765.09 in unpaid legal fees based on Steve's representation related to the trust and conservatorship of her father.

89. Beck incurred at least an additional $6,618.68 in interest on the balance owing for the legal fees from Steve's representation related to the trust and conservatorship of her father. The interest has been calculated at the statutory rate of 10% per annum.

## CAUSE OF ACTION
## DECLARATORY RELIEF

### FIRST GROUNDS FOR DECLARATORY RELIEF
### FRAUDULENT TRANSFER UNDER UTAH CODE ANN. § 25-6-5(1)(A)

90. Steve incorporates by reference the preceding allegations as if set forth in full herein.

91. Beck is a debtor to Steve for the attorney fees she incurred during the course of Steve's representation of her. Beck's obligation as a debtor to Steve arose before she conspired with Madsen to avoid paying Steve for the attorney fees she incurred.

92. Beck and Madsen were on notice no later than November 2007 that Steve's attorney lien attached to the retirement award in favor of Beck, to her retroactive alimony award and to her ongoing alimony award before they conspired to prevent Steve from being paid or receive any portion of the property Madsen was obligated to pay Beck.

93. Madsen and Beck acted with the actual intent to delay, hinder, or defraud Steve as Beck's creditor.

94. On January 23, 2008, without notifying Steve, Madsen and Beck filed with the divorce court a stipulation in which they modified the *Second Amended Findings of Fact and Conclusions of Law*, reducing Beck's monthly alimony to $1,200 and dismissing all debts and obligations between Madsen and Beck. Beck acted without representation of counsel.

95. Madsen and Beck's January 23, 2008 stipulation had the effect of settling all debts between them and dissolving any claims that Beck held for back alimony and attorney's fees against Madsen.

96. Madsen and Beck actively concealed their conspiracy and the January 23, 2008 stipulation from Steve.

97. Madsen and Beck actively concealed from Steve the disbursement of the DMBA retirement funds that Beck received under the QDRO.

98. Madsen and Beck's fraudulent actions caused Steve to suffer damages of approximately $35,581.41.

99. Madsen and Beck's actions in conspiring in an attempt to delay, hinder, or defraud Steve were willful and malicious or manifested a knowing and reckless indifference toward, and a disregard of, Steve's rights.

### SECOND GROUNDS FOR DECLARATORY RELIEF
#### INTENTIONAL AVOIDANCE OF ATTORNEY LIEN

100. Steve incorporates by reference the preceding allegations as if set forth in full herein.

101. Pursuant to UTAH CODE ANN. § 38-2-7, Steve has an attorney lien for the balance of compensation due from Beck that attaches to any property that is the subject of, or connected with, the work performed for her.

102. Steve made formal demands for payment according to his lien to both Madsen and Beck. Steve also filed a notice of attorney lien with the Salt Lake County Recorder and with Utah's Fourth District Court. Thus, Madsen had actual and constructive knowledge of Steve's attorney lien.

103. Despite this knowledge, Madsen has refused to honor Steve's attorney lien. In contravention of the attorney lien, Madsen paid Beck approximately $50,000 of his DMBA retirement account and $51,600 in alimony. Also in contravention of the attorney lien, Beck forgave Madsen's obligations to pay her $24,608.22 in back alimony, $24,181.41 in additional alimony, and one-half of his military retirement.

104. Madsen and Beck had the duty to inform Steve of their proposed actions before Madsen paid Beck approximately $50,000 of his DMBA retirement account and $51,600 in alimony and before Beck forgave Madsen's obligations to pay her $24,608.22 in back alimony, $24,181.41 in additional alimony, and one-half of his military retirement.

105. Instead of informing Steve of the proposed actions, Madsen and Beck actively concealed them so that Steve would not receive any portion of the retirement funds or alimony.

106. Steve was entitled to advance notice before the divorce court entered the January 2008 and March 2011 orders that reduced Madsen's obligations to Beck.

107. Steve did not receive advance notice before the divorce court entered the January 2008 and March 2011 orders that reduced Madsen's obligations to Beck.

108. Madsen is liable for all payments made to Beck in contravention of Steve's lien which total approximately $73,394.04.[1]

109. Madsen and Beck's actions in failing to comply with Steve's attorney lien were willful and malicious or manifested a knowing and reckless indifference toward, and a disregard of, Steve's rights.

### THIRD GROUNDS FOR DECLARATORY RELIEF
### INTENTIONAL INTERFERENCE WITH ECONOMIC RELATIONS

110. Steve incorporates by reference the preceding allegations as if set forth in full herein.

111. Madsen was at all material times aware of the fact that Steve enjoyed a contractual relationship with Beck.

112. Madsen intentionally interfered with Steve's contractual relationship with Beck by advising, counseling, and encouraging Beck not to perform on her obligations under her contract with Steve and not to honor Steve's attorney lien.

113. Madsen intentionally interfered with Steve's contractual relationship with Beck by encouraging and assisting her to terminate her relationship with Steve and enter into a new stipulation without notifying Steve, without the benefit of counsel, and for the purposes of delaying, hindering, or defrauding Steve as Beck's creditor.

114. Madsen intentionally interfered with Steve's contractual relationship with Beck by engaging in tactics to delay, hinder, or defraud Steve as Beck's creditor.

115. Madsen acted with an improper purpose in his intentional interference with Steve's contractual relations with Beck.

---

[1] This includes the $35,581.41 alleged under the Fraudulent Transfer section.

116.  Madsen has stated, on numerous occasions, his belief that Steve is a "robber" and that Steve's attempt to collect and enforce Beck's obligations is "immoral."

117.  Madsen was motivated by the intent to inflict injury upon Steve by preventing him from receiving payment for the services rendered to Beck.

118.  Madsen employed improper means when he intentionally interfered with Steve's contractual relations with Beck.

119.  Madsen counseled and encouraged Beck not to perform on her obligations under her contract with Steve.

120.  Madsen employed improper means by engaging in tactics to delay, hinder, or defraud Steve.

121.  Madsen employed improper means by refusing to cooperate with a lawful assertion of an attorney lien and assisting Beck to avoid the attorney lien.

122.  Madsen's actions have prevented Steve from receiving payment for the services he rendered Beck.

123.  After Madsen interfered with Steve's economic relations with Beck, Beck fired Steve.

124.  Madsen's actions have caused Steve to suffer damages of approximately $89,777.81.[2]

125.  Madsen's conduct was willful and malicious or manifested a knowing and reckless indifference toward, and a disregard of, Steve's rights.

---

[2] This includes the $35,581.41 and the $73,394.04 alleged under the Fraudulent Transfer and Intentional Avoidance of Attorney Lien sections.

**PRAYER FOR RELIEF**

WHEREFORE, Steve prays for judgment against Madsen as follows:

1. For a declaration that Madsen's liability to Steve is not dischargeable in bankruptcy, and

2. For such further and other relief as the Court deems just and proper.

DATED this 28th day of August, 2013.

**CHRISTENSEN CORBETT & PANKRATZ, PLLC**

/s/Craig L. Pankratz
*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I, _Tara Jones_ , certify that I am, and at all times during the service of process was, not less than 18 years of age and not a party to the matter concerning which service of process was made.

I further certify that the service of this summons and a copy of the complaint was made _8/28/2013_ [Date] by:

[X] Mail Service – Regular, first class United States mail, postage fully pre–paid, addressed to:

Raymond William Madsen    Kevin R. Hansen
290 Taylor Blvd. Sequim, WA 98382,    Attorney at law
[ ] Personal Service – By leaving the documents with the following defendant(s) or an officer or agent of the defendant(s) at:    1107 E. Front St. Ste C
    Port Angeles, WA 98362

[ ] Residence Service – By leaving the documents with the following adult at:

[ ] Certified Mail Service on an Insured Depository Institution: BY sending the process by certified mail addressed to the following officer of the defendant at:

[ ] Publication – The defendant was served as follows: [describe briefly]

[ ] State Law – The defendant was served pursuant to the laws of the State of _____, as follows: [describe briefly]

Under penalty of perjury, I declare that the foregoing is true and correct.

_8/28/2013_
[Date]

_Tara Jones_
[Signature]

| | |
|---|---|
| Print Name | Tara Jones |
| Business Address | 136 E. South Temple, Suite 1400 |
| City SLC | State UT   ZIP 84111 |

Jory L. Trease (USB#4929)
JORY L. TREASE, ESQ., INC.
254 West 400 South, Suite 303
Salt Lake City, UT 84101
jory.jtbankruptcy@gmail.com
Telephone (801) 596-9400

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In re: **RAYMOND WILLIAM MADSEN and NILA DAWN MADSEN,** <br><br> **Debtors.** | **Bankruptcy No. 13 - 80001** <br> **[Chapter 7]** |
| **STEVE S. CHRISTENSEN and STEVE S. CHRISTENSEN, P.C.,** <br><br> **Plaintiff,** <br> **vs.** <br><br> **RAYMOND MADSEN,** <br><br> **Defendant.** | **Adversary Proceeding No.: 13-02310** <br><br><br> **Judge: William T. Thurman** |

**MOTION TO DISMISS ADVERSARY COMPLAINT (Docket Entry No. 1) BASED ON LACK OF PERSONAL & SUBJECT MATTER JURISDICTION, IMPROPER VENUE, FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED, FAILURE TO JOIN AN INDISPENSABLE PARTY; AND, MOTION TO IMPOSE APPROPRIATE SANCTIONS AGAINST PLAINTIFFS AND THEIR COUNSEL UNDER VARIOUS PROVISIONS & RULES OF THE U.S. BANKRUPTCY CODE**

**COMES NOW** the Debtor, Raymond William Madsen (hereinafter referred to as

"Debtor"), by and through his Attorneys of Record, more specifically  JORY L. TREASE,

ESQ., INC., and pursuant to 28 U.S.C. §§1334, 1408, and 1409; 11 U.S.C. §§105, 524, and

Bankruptcy Rules 7012 and 7019, hereby moves to dismiss the pending Adversary Proceeding

which has been filed against the Debtor/Defendant by the Plaintiff. The Debtor/Defendant

contends that the Court currently lacks personal and subject matter jurisdiction over the Debtor;

the Complaint fails to state a claim upon which any relief may be granted; fails to join and

indispensable party, and joinder of such person is unfeasible given her own independent

Bankruptcy Case that has discharged any obligation owed to the Plaintiff(s); and thus, the

Complaint in it's entirety is subject to dismissal under the applicable provisions of the Federal

Rules of Civil Procedure and Bankruptcy Rules. Furthermore, based on the prior and present

conduct of the Plaintiff(s) in this case, the Debtor/Defendant affirmatively asserts that

appropriate sanctions be imposed by the Court to deter similar conduct by the Plaintiffs from

occurring in the future.

Debtor specifically reserves the right to present additional evidence, information, and

supportive testimony at any subsequently held oral argument of this motion. In further support

of the current motion, he proffers the following:[1]

////

//// *(the remainder of this page has been left intentionally blank for continuity purposes)*

////

---

[1]. By filing the present motion, the Debtor does not waive any claim related to improper procedures which may have been employed by the Creditor and their Counsel in the past, or which may be occurring presently, or in the future. Such reservation is specifically intended to include, but not limited to claims the Debtor may have against the Creditor and it's Counsel pursuant to Bankruptcy Rule 9011 and 11 U.S.C. §523(d). The present motion is being submitted solely to protect the Debtor's rights under the U.S. Bankruptcy Code. Furthermore, the filing of the present Motion by the Debtor/Defendant is not to be construed as a waiver of any claims the Debtor asserts related to a lack of personal jurisdiction by the present tribunal.

## <u>FACTS</u>

1. The Debtor/Defendant, Raymond William Madsen, commenced a joint Chapter 7 Bankruptcy Petition (Case No. 13-16327-MLB) on July 10, 2013, in the U.S. Bankruptcy Court for the Western District of Washington (Seattle Division).

2. Debtor/Defendant, Raymond William Madsen, presently, and at all times relevant herein is/has been a lawful resident of the State of Washington.

3. Any claims being asserted by the Plaintiff against the Debtor/Defendant revolve around a divorce or domestic relations case between the Debtor/Defendant and his ex-wife; which culminated in a Decree of Divorce being granted severing the bonds of matrimony between the parties in 2004.

4. The Plaintiff, Attorney Steve S. Christensen, previously represented the Debtor/Defendant's ex-wife (hereinafter referred to as "Ms. Beck") in the aforementioned legal proceedings identified in the immediately preceding paragraph.

5. The Plaintiff, Attorney Steve S. Christensen, openly admits that he and the Debtor/Defendant, Raymond William Madsen, have no contractual or professional relationship that has been entered into between the parties. Likewise, Plaintiff acknowledges that the Debtor/Defendant has not guaranteed Ms. Beck's obligations to the Plaintiff.

6. In fact, Plaintiff admits that he does not even have a signed written retainer agreement with the Debtor/Defendant's ex-wife, Ms. Beck.

7. The Plaintiff's original client, Ms. Beck, failed to satisfy the legal fees being claimed against her by the Plaintiff and/or his law firm.

8. The Plaintiff asserts that Ms. Beck also employed his law firm to provide legal services unrelated to the domestic relations case involving the Debtor/Defendant.

9. It is believed that Ms. Beck terminated the Plaintiff's legal representation of her interests prior to instigating any formal collection efforts against the Debtor/Defendant on her behalf.

10. Debtor/Defendant, is not and was not aware of any details related to the financial arrangements which were agreed upon between his ex-wife and her Attorney.

11. It is believed that the Fourth District Court for the State of Utah, on or about January 23, 2008, approved the joint stipulation between the Debtor/Defendant and his ex-wife (Ms. Beck) which declared that ". . . all monies owed for past due alimony, property settlement, attorney's fees, etc., have been paid and that neither party is indebted to the other as of the date of the execution of the agreement."

12. Entry of the post-trial stipulation between the parties sufficiently resolved the disputes that were currently on appeal in the case, and approximately one month later the Debtor/Defendant notified the Court of Appeals of such status, requesting a release of the appellate bond that had previously been provided to the Court.

13. A subsequent modification in the Divorce Court was entered on or about March 25, 2011, further addressing the issues of retirement distribution and alimony. Effectively, such State Court Order reduced the Debtor/Defendant's alimony obligation to $500.00 per month, and released any claim Ms. Beck had previously had related to her ex-husband's military retirement.

14. No Order or ruling from any Court of competent jurisdiction has determined that the Plaintiff has any claim against the Debtor/Defendant.

## FACTS RELATED TO BANKRUPTCY FILING OF PLAINTIFF'S
## PRIOR DIVORCE CLIENT, Ms. BECK

15. Ms. Beck, the Plaintiff's prior client in the divorce proceedings (and other legal matters), commenced a Bankruptcy Petition in the U.S. Bankruptcy Court for the District of Utah on June 12, 2012 (Case No. 12-27634 RKM).

16. The Plaintiff herein, Steven S. Christensen, had actual knowledge of the Bankruptcy Case filed by Ms. Beck, and has participated in the same by filing various pleadings.

17. A Discharge Order was entered in Ms. Beck's Bankruptcy Case on December 26, 2012.

18. The Bankruptcy Court Clerk established the deadline to file actions objecting to the discharge of certain debts in Ms. Beck's case as December 24, 2012.

19. Plaintiff herein, Steve S. Christensen, did not timely file an Adversary Proceeding in the Bankruptcy Case of Ms. Beck.

20. Plaintiff, filed Proof of Claim No. 5 in the Bankruptcy Case of Ms. Beck, thus illustrating that he had actual knowledge and notice of such case. [2]

//// 

//// 

//// *(the remainder of this page has been left intentionally blank for continuity purposes)*

//// 

---

[2]. It is noted that the Proof of Claim filed by Plaintiff in the Bankruptcy Case of Ms. Beck identifies that the law firm associated with the indebtedness is Christensen Thornton, PLLC, rather than the entity asserted presently by the Plaintiff in the current Adversary Proceeding.

## ARGUMENT

## I. THE U.S. BANKRUPTCY COURT FOR THE DISTRICT OF UTAH CURRENTLY LACKS PERSONAL JURISDICTION UNDER FEDERAL RULE OF CIVIL PROCEDURE 12(b)(2).

Federal Rule of Civil Procedure 12(b), which has been adopted by Bankruptcy Rule 7012, mandates that "A motion asserting any of these defenses [under F.R.Civ.P. 12(b)] must be made before pleading if a responsive pleading is allowed".   The Debtor/Defendant commenced his Bankruptcy Petition under Chapter 7 of the U.S. Bankruptcy Code in the U.S. Bankruptcy Court for the Western District of Washington, Seattle Division.  Debtor/Defendant resides within the jurisdictional boundaries of the State of Washington.   Thus, the U.S. Bankruptcy Court for the District of Utah currently lacks personal jurisdiction over the Debtor as required under F.R.Civ.P. 12(b)(2).

Pursuant to 28 U.S.C. §1334(e), "the district court in which a case under title 11 is commenced or is pending shall have *exclusive jurisdiction* – (1) of all the property, wherever located, of the debtor as of the commencement of such case, and of property of the estate. . ." (*emphasis added*) The underlying principle of the Plaintiff's pending Adversary Complaint is to seek a determination of non-dischargeability[3], thus enabling Plaintiff to attach or pursue property of the Debtor/Defendant.  Section 1334 of the U.S. Code dictates that the U.S. Bankruptcy Court for the Western District of Washington (Seattle Division) exercises exclusive jurisdiction over

---

[3]   Although the Complaint is captioned as seeking "Declaratory Relief", the content of the allegations and Prayer irrefutably seeks a determination of non-dischargeability. It is anticipated that the Complaint has been drafted in such manner to avoid the application of 11 U.S.C. §523(d) in which the Debtor would be entitled to claim compensation for his legal fees incurred upon successful defense against the pending action. It is affirmatively asserted by the Debtor/Defendant that the Court should impose appropriate sanctions against the Plaintiff, his law firm, and the Attorneys thereof under any combination of 11 U.S.C. §105, 11 U.S.C. §523(d), and/or Bankruptcy Rule 9011, particularly given the history of this Plaintiff and his law firm(s) similar claims presently and in the past, both in the Bankruptcy Court and in the various State tribunals.

the Debtor/Defendant's property interests because that is where his Petition in Bankruptcy is currently pending.

The Bankruptcy Court for the District of Utah lacks personal jurisdiction over the Debtor/Defendant within the pending Adversary Complaint; and thus the Plaintiff's Complaint should be dismissed.

## II. THE U.S. BANKRUPTCY COURT FOR THE DISTRICT OF UTAH CURRENTLY LACKS SUBJECT MATTER JURISDICTION UNDER FEDERAL RULE OF CIVIL PROCEDURE 12(b)(1).

The standard official form RAB9A (more commonly referred to as the 341 Notice, or the "Notice of Chapter 7 Bankruptcy Case, Meeting of Creditors, & Deadlines"), clearly directs parties that "any paper that you file in this bankruptcy case should be filed at the bankruptcy clerk's office at the address listed on the front side. Similarly, such notice also identifies that the referenced bankruptcy clerk's office must receive the complaint or motion by the specified deadline, or the contested debt will be discharged.

The current Adversary Complaint revolves around a disputed debt which the Plaintiff asserts the Debtor/Defendant owes associated with the Plaintiff's prior representation of the Debtor's ex-wife in a domestic relations case. The current case has not been filed in the pending Bankruptcy Case for the Debtor's ex-wife (*e.g.;* Linda Diane Beck, Case No. 12-27634 UT) because Plaintiff recognizes that his past client has previously received a discharge of the debt he is attempting to collect from the Debtor/Defendant in the present case; and to do so would subject him to monetary sanctions under 11 U.S.C. §524.

The current Adversary Proceeding represents such an anomaly in the law, that the Bankruptcy Clerk has been required to take extraordinary steps in fabricating an underlying Bankruptcy Case (*i.e.;* Case No. 13-80001) within the District of Utah to facilitate the filing of the Adversary Complaint. The Debtor/Defendant has no connections with the District of Utah, and the subject matter of the pending Complaint does not exist within this jurisdiction.

The subject matter addressed within the Adversary Complaint is supposedly based upon an admittedly non-existent contractual, or quasi-contractual, claim by the Plaintiff against the Debtor/Defendant. Under the circumstances, the subject matter jurisdiction in the present case would be more properly exercised by the forum in which there is an actual, rather than fictional, underlying Bankruptcy Case pending.

The Bankruptcy Court for the District of Utah lacks subject matter jurisdiction over the issues addressed within the pending Adversary Complaint; and thus the Plaintiff's Complaint should be dismissed.

### III. VENUE IS IMPROPER WITHIN THE U.S. BANKRUPTCY COURT FOR THE DISTRICT OF UTAH UNDER F.R.Civ.P. 12(b)(3)

The proper venue for cases under the U.S. Bankruptcy Code is specifically codified under 28 U.S.C. §1408, which reads:

"Except as provided in section 1410 of this title, a case under title 11 may be commenced in the district court for the district –
        (1) in which the domicile, residence, principal place of business in the United States, or principal assets in the United States, of the person or entity that is the subject of such case have been located for the one hundred and eighty days immediately preceding such commencement, or for a longer portion of such one-hundred-and-eighty-day period than the domicile, residence, or principal place of

business, in the United States, or principal assets in the United States, of such person were located in any other district; or

(2) in which there is pending a case under title 11 concerning such person's affiliate, general partner, or partnership."

There is no dispute that the Debtor/Defendant has resided exclusively in the State of Washington since October 2010, well beyond the 180 days preceding the commencement of his Bankruptcy Petition in the U.S. Bankruptcy Court for the Western District of Washington (Seattle division). The situs of his domicile and principal assets are entirely located within the State of Washington; thus, under 28 U.S.C. §1408(1), the proper venue for the pending Adversary Complaint is not within the U.S. Bankruptcy Court for the District of Utah.

The second paragraph of 28 U.S.C. §1408 contemplates and pertains to claims that are being asserted against ancillary parties within the secondary party's own bankruptcy case. Such is not the case in the present litigation. The Debtor/Defendant does not have an associate, general partner, or partnership, in which there is a currently pending bankruptcy case; and, even if there were such a case, the Plaintiff would encounter two (2) substantive complications. First, as contemplated by 28 U.S.C. §1408, the present Adversary Case would have been commenced within the pending Bankruptcy Case, not requiring a fictitious Bankruptcy Case to be established in order to accommodate the Adversary Proceeding. Secondly, by proceeding with such a filing, the Plaintiffs would be subjecting themselves to substantial sanctions for the violation of the automatic stay under 11 U.S.C. §362 in the Debtor/Defendant's pending Bankruptcy Case in the State of Washington since the Complaint itself acknowledges that he has such a pending case.

According to 28 U.S.C. §1408, the proper venue for the currently pending Adversary Complaint is not in the U.S. Bankruptcy Court for the District of Utah. Thus, the Plaintiff's Complaint should be dismissed.

## IV. FAILURE TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED UNDER FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6).

Plaintiffs' Adversary Complaint is woefully deficient in setting forth factual allegations sufficient to establish a claim upon which any relief can be granted under the U.S. Bankruptcy Code.

### A. The Adversary Complaint seeks a determination of Non-Dischargeability of a debt, not declaratory relief.

Despite the Plaintiff's poorly veiled attempts to portray the present Adversary Complaint as an action seeking declaratory relief, the sum and substance of the same clearly desires a determination of non-dischargeability of the claim(s) being asserted by the Plaintiffs against the Debtor/Defendant. Sporadically, the Adversary Complaint will incorporate key words and phrases typically associated with causes of action under 11 U.S.C. §§523 and 727, but fails to cohesively satisfy the total elements of any such claim. Likewise, the factual allegations fall short of sufficiently asserting any particular claim under the U.S. Bankruptcy Code.

////

//// *(the remainder of this page has been left intentionally blank for continuity purposes)*

////

### i. Debtor/Defendant owes no debt or duty to the Plaintiff(s).

The Plaintiffs admit that they have no written retainer agreement[4] signed with their original client, the Debtor's ex-wife; let alone any agreement with the Debtor/Defendant himself. Plaintiffs further acknowledge that Debtor/Defendant has never contracted with them, entered into a binding agreement, or otherwise consented to any particular conduct in favor of the Plaintiffs. (*See:* Complaint ¶85)

There is no statement in writing between the Plaintiff(s) and the Debtor/Defendant. Plaintiff(s) did not provide any money, property, services, or an extension, renewal, or refinancing of credit to the Debtor/Defendant. The Debtor/Defendant owes no money directly to the Plaintiff(s).

### ii. Plaintiff has insufficient pled any evidence of fraud.

Plaintiff(s) make cursory allegations related to fraudulent conduct of the Debtor/Defendant, but fail to satisfy the standards under applicable 10th Circuit caselaw to support such allegations. Fraud must be pled with particularly: at least one of the causes of action purportedly contained within the Plaintiff's Complaint are founded upon a common allegation that the Debtor/Defendant acted with a fraudulent intent or otherwise committed fraud in the conduct complained of within the Complaint. Plaintiffs' pleading is vague and lacks the particularity required by Bankruptcy Rule 7009(b). The Complaint fails to meet the fundamental

---

[4]. Under the Rules of Professional Conduct for the Utah State Bar, any legal representation which is anticipated to exceed a certain monetary amount, mandates that a written retainer agreement be executed between the parties. The amounts being alleged in the present Adversary Complaint far exceed the amount contemplated by the referenced rule.

tests of properly pleading fraud under Rule 9(b), Fed. R. Civ. P. The Complaint also fails to state allegations of fact sufficient in particularity and clarity to fairly and reasonably advise the Debtor/Defendant of the "circumstances constituting fraud." Rule 9(b) F. R. Civ. P. *See:* In re Edmonds, 924 F.2d 176, 180 (10th Cir. 1991)(Fed. R. Bankr. P. 7009, incorporating Fed. R. Civ. P. 9(b)(1), requires that fraud be alleged with particularity, including allegations of the "time, place and contents of the false representations, the identity of the party making the false statement and the consequences thereof"); In re Stone, 1984 Bankr. LEXIS 4472 (bky. D. Utah 1984)(Section 523 requires that fraud be pled with particularity); In re Eilertsen, 2003 Bankr. LEXIS 324 (Bky. D. Utah 2003)(fraud must be pled with particularity under R. 7009). The Complaint is deficient in setting forth any particular allegations associated with any specific loan to which the Plaintiff claims the Defendant acted wrongfully.

### iii. Debtor is not a fiduciary of the Plaintiff(s), and owed no duty accordingly.

It is indisputable that the Debtor/Defendant was not acting in a fiduciary capacity on behalf of the Plaintiffs at any time referenced within the Complaint. Debtor owes no duty to the Plaintiffs. The only connection the Plaintiffs have to the Debtor/Defendant is the fact that they represented his ex-wife in a divorce proceeding against him.

The Plaintiff(s) is/are not a party to the underlying divorce proceedings between the Debtor/Defendant and his ex-wife. Plaintiff(s) did not enter any appearance in the divorce proceedings other than as legal counsel for the Debtor/Defendant's ex-wife. Thus, the Plaintiff was not entitled to any notice of further proceedings in the domestic relations case since his legal representation has been terminated by his client. It is evident that the Fourth District Court for

the District of Utah concluded that Plaintiff in the present Adversary Proceeding was not entitled to any notice, or else the State Court Judge would not have entered any subsequent rulings in the matter.

### iv. No evidence of any intentional tortious conduct exists in the current situation.

Although employment of key words are utilized by the Plaintiffs, there are insufficient allegations claiming that the Debtor/Defendant's conduct rises to the level of an intentional tortious degree; and, any claims of willful and malicious conduct are unsupported by any factual allegations or evidence of any degree.

Plaintiffs unsuccessfully attempt to adopt the language of "intent to hinder, delay, or defraud" in an effort to apply it to the facts of the case. The conduct complained of in the Adversary Complaint is that Debtor/Defendant continued to pay his alimony obligation to his ex-wife as mandated by the applicable Decree of Divorce rather than in accordance with the Plaintiffs' demands for some alternative payment arrangement. Similar arguments are made with respect to the Plaintiffs' desire regarding their prior client's (*i.e.;* the Debtor/Defendant's ex-wife) interest in the retirement proceeds that were accumulated during the marital relationship. Plaintiff wanted such funds to be paid directly to them rather than as required under applicable federal statutory limitations. Neither of these situations satisfy a basis for any claim upon which relief may be granted under the Bankruptcy Code.

////

//// *(the remainder of this page has been left intentionally blank for continuity purposes)*

////

-13-

### v. Res judicata and collateral estoppel invalidate the Plaintiff(s) claims against the Debtor.

Plaintiffs admit that relevant provisions in the Orders of the domestic relations case between the Debtor/Defendant and his ex-wife have effectively obliterated any debt for past due alimony upon which the Plaintiffs' Complaint is founded. Under legal theories of *res judicata* and *collateral estoppel*, the prior Orders of the Fourth District Court for the State of Utah establish that the Plaintiffs' claims are lacking in merit at the present time.

The Utah State District Court has ruled contrary to the allegations of the Plaintiff, and the legal theories of *res judicata* and *collateral estoppel* apply. If the allegations of the Plaintiff are correct in asserting the applicability of the Attorneys lien, the Court has ruled contrary to the Plaintiff's interpretation of the same during the process of the subsequent modifications to the Decree of Divorce between the Debtor/Defendant and his ex-wife.

### B. Federal Statutory provisions under ERISA are contary to the Plaintiffs' premise within the Adversary Complaint.

One of the primary bases of the Plaintiffs' pending Adversary Complaint is that the Debtor/Defendant has conspired to have his ex-wife's portion of his retirement distributed directly to her rather than to the Plaintiffs' under the claimed Attorney's lien.

Debtor/Defendant has been previously notified in writing, on or about September 12, 2013, from Deseret Mutual Benefits Administration (DMBA), the retirement administrator involved in the parties divorce proceedings, that specific provisions of ERISA prohibit distributions under a QDRO from being assigned to any creditor, and cannot be alienated from

the recipient. Thus, Plaintiff's claims against the Debtor/Defendant are contrary to the standards set forth in federal statutory provisions.

It is believed that Plaintiffs', being legal professionals with substantial experience in the domestic relations field, are well aware of the restrictions and limitations related to QDRO distributions under ERISA. Furthermore, it is believed that DMBA may have previously communicated such restrictions directly to Plaintiffs'. Nonetheless, given the restrictions for distributions of QDRO proceeds, the Plaintiffs' pending Adversary Complaint fails to state a claim to which relief may be granted in this regard.

## C. Plaintiffs' original client, the Debtor's ex-wife, Ms. Beck, has previously filed a Bankruptcy Case.

Linda Diane Beck, the Debtor/Defendant's ex-wife and the Plaintiffs' original client in the current action, filed her own voluntary Bankruptcy Petition under Chapter 7 of the Bankruptcy Code on June 12, 2012. (*See:* Case No. 12-27634 UT) Such case was discharged on December 26, 2012. Plaintiff(s) and their Counsel herein received actual notice of Ms. Beck's Bankruptcy Petition; and, various other pleadings in the case.[5] The Plaintiff herein has failed to seek any determination from the Bankruptcy Court as to the secured status of his claim under 11 U.S.C. §506. Instead, Plaintiff(s) have elected a more indirect method, thereby avoiding involvement of Ms. Beck, her Bankruptcy Counsel, and notice to her of their intentions to

---

[5] . Counsel for Ms. Beck filed a Motion for Order to Show Cause addressing why the Plaintiffs herein (as well as the Debtor/Defendant herein) should not be sanctioned for violating the automatic stay. (*See:* Docket #45, In re: Beck, Case No. 12-27634 UT) Ms. Beck and her Counsel were asserting that the specific conduct that Plaintiffs' herein seek to enforce (*i.e.;* payment of future alimony owed to Ms. Beck to the Plaintiff herein) was a violation of her Bankruptcy stay.

enforce the alleged Attorney's Lien, although the automatic stay and/or discharge stay remains in effect.

Upon information and belief, Debtor/Defendant alleges that the indebtedness owed to Plaintiffs herein by his ex-wife, Ms. Beck, has been discharged and extinguished. The deadline for the Creditor to file an Adversary Proceeding under B.R. 7001(2) to determine the validity, priority, or extent of a lien has expired in her independent Bankruptcy Case. If the debt of Ms. Beck, as the original obligor to the Plaintiff(s) herein has been discharged, the Plaintiff(s) have failed to state a claim upon which relief may be granted against Mr. Madsen presently.

The Plaintiffs' have previously filed a Motion for Relief from the Automatic Stay in Ms. Beck's Bankruptcy Case wherein they have alleged that Mr. Madsen is not a co-debtor of his ex-wife, Ms. Beck. (*See:* Docket No. 26, filed 9/11/12 in Case No. 12-27634 UT) There has been no prior determination that Mr. Madsen is obligated to submit payments other than as dictated by the parties Decree of Divorce. Debtor/Defendant has consistently paid such obligations as directed by the domestic relations court for the State of Utah.

The validity and extent of the Attorney's Lien alleged by the Plaintiffs to exist is unknown. The only properly perfected Attorneys Lien on file with the County Recorder's Office was filed on April 29, 2004. Such document specifically reflects a monetary amount of $2,761.99. No other legally binding communication has been provided to the Debtor/Defendant to reflect the amount that is claimed owed to the Plaintiffs by their prior client, the Debtor's ex-wife, Ms. Beck.

Under the prevalent circumstances, the Plaintiff(s) have failed to sufficiently state a claim upon which relief may be granted because there is no determination that a valid and enforceable

Attorneys Lien exists, or that the Debtor/Defendant has an obligation to pay funds that have previously been discharged in the original obligor's independent Bankruptcy proceedings.

## V. PLAINTIFFS HAVE FAILED TO NAME AN INDISPENSABLE PARTY TO THE PROCEEDINGS UNDER FEDERAL RULE OF CIVIL PROCEDURE 12(b)(7).

Pursuant to F. R. Civ. P. 12(b)(7) and F. R. Civ. P. 19 (adopted respectively by BR 7012 and BR 7019) the Plaintiffs have failed to join an indispensable party to the present litigation. As is evident from the myriad number of allegations within the Plaintiffs' Complaint, Ms. Beck is irrefutably a necessary party to determination of the present claims being asserted by the Plaintiff. However, this undoubtedly presents a logistical problem for the Plaintiffs because they have permitted the deadline to bring such claims against Ms. Beck to expire in her independent Bankruptcy Case.

Under F. R. Civ. P. 19(a)(1)(A), the Court in the current circumstances can not accord complete relief among the existing parties (*e.g.;* the Plaintiffs and Mr. Madsen), because the allegations of the Complaint consistently allege Ms. Beck was purportedly acting in concert with Mr. Madsen. Similarly, under F. R. Civ. P. 19(a)(1)(B), the crux of the Complaint revolves around the Plaintiffs' claim to receive the future alimony payments and other financial funds awarded to Ms. Beck under the terms of the Decree of Divorce. Ms. Beck undoubtedly claims an interest in such alimony and other monetary funds, and disposing of the present claims of the Plaintiffs in the absence of Ms. Beck's participation in the litigation as a practical matter will impair or impede her ability to protect her interest in the same.

Furthermore, as contemplated by F. R. Civ. P. 19(a)(1)(B)(ii), pursuing the litigation between the currently named parties, without Ms. Beck, raises the potential risk of subjecting the Debtor/Defendant, Mr. Madsen, of double, multiple, or otherwise inconsistent obligations. Mr. Madsen is currently under the obligation pursuant to the modified Decree of Divorce entered by the Utah State Court to make alimony payments to Ms. Beck. The pending Adversary Complaint being litigated by the Plaintiffs requests a ruling from this Court to require Mr. Madsen to submit those same alimony payments to the Plaintiffs rather than to Ms. Beck. Such a conflict illustrates the necessity for joinder of Ms. Beck to the present litigation in order to achieve a just adjudication of the issues.

Nonetheless, the Debtor/Defendant is not advocating such an alternative because he is under the belief that the indebtedness owed by Ms. Beck to her prior Attorneys, the Plaintiffs herein, has been discharged and eradicated under the provisions of her Bankruptcy Case, including but not limited to the failure of the Plaintiffs to timely seek determination of the validity of their lienholder status, or to otherwise seek a determination of nondischargeablility of their asserted claims to receive on-going alimony payments, prior to the deadline established by the Court Clerk for filing Adversary Complaints to determine such issues.

Since the Debtor's ex-wife has been discharged of any indebtedness owed to the Plaintiffs herein, it appears that joinder is not feasible. Thus, under F. R. Civ. P. 19(b), it is asserted that the Plaintiffs' Adversary Complaint should be dismissed.

////

//// *(the remainder of this page has been left intentionally blank for continuity purposes)*

////

## VI. MONETARY SANCTIONS ARE NECESSARY TO ADDRESS THE WRONGFUL CONDUCT OF THE PLAINTIFF(S) AND THEIR LEGAL COUNSEL IN THE PRESENT CASE.

Plaintiff(s), Steve S. Christensen and his various law firms in which he is associated, have established a history and *modus operandi* of similar conduct in this Court, and other State Court matters, in which he wrongfully attempts to obligate the opposing party in domestic cases to pay for his legal fees that were incurred through his representation of others.

Section 105 of the U.S. Bankruptcy Code, Bankruptcy Rule 9011, and standards of equity, all warrant the imposition of appropriate sanctions against the Plaintiff, his law firm, and the Attorneys asserting the present claims against the out-of-state Debtor/Defendant under the circumstances of the present case. First and foremost, the proper forum for bringing an Adversary action against the Debtor/Defendant is in the Court in which the Debtor resides and his voluntary Bankruptcy Petition was commenced. In this case, the U.S. Bankruptcy Court for the Western District of Washington (Seattle Division) is the proper venue and Court that exercises personal and subject matter jurisdiction over the parties, not the District of Utah. Secondly, the factual allegations of the Plaintiffs acknowledge that they do not have a written contract with their own client, let alone the Debtor/Defendant. Third, the debt of the original obligor to the Plaintiffs has been discharged in Bankruptcy, and no longer exists. Thus, there is no debt to collect from the Debtor/Defendant herein, even if he were obligated in any fashion. Fourth, the domestic relations Court for the State of Utah has modified the parties Decree of Divorce and specifically held that the Debtor/Defendant herein does not owe any funds to his ex-wife related to legal fees she may have incurred. Many other factors identified within the foregoing motion support the conclusion that equity dictates that sanctions should be imposed

against the Plaintiffs and their Counsel for the actions being attempted to be pursued in the present case.

The most telling factor that supports the imposition of sanctions against the Plaintiffs and their Counsel in the present case is the fact that upon attempting to file the present Adversary Complaint against the Debtor/Defendant, the Bankruptcy Court Clerk for the District of Utah contacted the Plaintiffs' Counsel and discussed the jurisdictional quandary that existed in filing a case against an out-of-state Debtor-in-Bankruptcy. Despite the Bankruptcy Court Clerk's efforts to identify the jurisdictional problems, the Plaintiffs demanded and insisted to commence the Adversary Proceeding in the State of Utah instead of the State of Washington.

It is evident that the true intent of the Plaintiffs is to inflict as much emotional and financial toil upon the Debtor/Defendant as possible in causing him to hire Local Counsel to defend his interests in this jurisdiction rather than the jurisdiction of his domicile and where his actual Bankruptcy Petition is pending. At present, the Debtor/Defendant has incurred $5,000.00 in legal expenses to file the present Motion to Dismiss, and will likely incur significant other costs and expenses prior to bringing this matter to a conclusion. As is inherent in Bankruptcy Cases, the Debtor/Defendant does not have any discretionary income to fund such unfounded legal matters being brought in bad faith by the Plaintiffs, in the hopes that the Debtor/Defendant simply will succumb to the unusual litigation tactics of the Plaintiffs.

It simply appears that the only method that will prevent this conduct from reoccurring is if sufficient monetary sanctions are imposed against Mr. Christensen and his legal representatives. It is anticipated that the evidence to be presented at the scheduled hearing in

-20-

this matter will further illustrate the Plaintiff's unusual tactics, both in the present case and historically, sufficient to warrant the Bankruptcy Court to exercise it's powers under 11 U.S.C. §105, B.R. 9011(c)(1)(B), and other equitable standards, in an effort to protect the Debtor/Defendant's anticipated rights under the Bankruptcy Code.

**BASED UPON THE FOREGOING,** the Court should grant the Debtor/Defendant's Motion to Dismiss; rule that the Court currently lacks personal jurisdiction over the Debtor because the underlying Bankruptcy Case has been commenced in the State of Washington, not in this jurisdiction; rule that the Court lacks subject matter jurisdiction; find that the Plaintiffs have failed to set forth a claim upon which relief may be granted; rule that Ms. Beck is an indispensable party, and thereby dismiss the Adversary Complaint due to the Plaintiff's failure to join such person, and based on her prior Bankruptcy Discharge of the debt hold that her joinder is not feasible;  and, given the current and past history of this particular Plaintiff(s) conduct before this Court, impose appropriate monetary sanctions pursuant to §105 of the Bankruptcy Code, B.R. 9011(c)(1)(B), and other equitable standards to deter future similar conduct by the Plaintiffs.

**RESPECTFULLY SUBMITTED AND DATED** this 30th day of September, 2013.

> /s/ Jory L. Trease
> Jory L. Trease
> Attorney for Defendant/Debtor
> Raymond William Madsen

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY this 30th day of September, 2013, I caused a true and correct copy of the foregoing **MOTION TO DISMISS ADVERSARY COMPLAINT (Docket Entry No. 1) BASED ON LACK OF PERSONAL & SUBJECT MATTER JURISDICTION, IMPROPER VENUE, FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED, FAILURE TO JOIN AN INDISPENSABLE PARTY; AND, MOTION TO IMPOSE APPROPRIATE SANCTIONS AGAINST PLAINTIFFS AND THEIR COUNSEL UNDER VARIOUS PROVISIONS & RULES OF THE U.S. BANKRUPTCY CODE** to be served upon the following, by depositing a copy of the same in the United States Postal Service, first-class postage prepaid (or as otherwise indicated) and addressed as follows:

Craig L. Pankratz                                    (Via ECF & USPS)
Christensen Corbett & Pankratz
136 East South Temple, Suite 1400
Salt Lake City, UT 84111-3156

Kevin Hansen                                         (Via USPS)
Attorney for Debtor, Raymond W. Madsen
1607 E Front St., Suite C
Port Angeles, WA 98362

Raymond William Madsen                               (Via email)
290 Taylor Blvd.
Sequim, WA 98382

United States Trustee                                (Via ECF)
405 South Main Street, Suite 300
Salt Lake City, UT 84111

                                    /s/ Jory L. Trease

Madsen-Christensen.Mtn2QuashSummonsdismss.wpd
JLT/dm

-22-